**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| In re:<br><br>IDL DEVELOPMENT, INC.,<br><br>Debtor | Chapter 11<br>Case No. 18-14808-CJP |

**ORDER SUSTAINING THE DEBTOR'S OBJECTION TO CLAIM #6-1**

Upon consideration of the *Objection to Priority Claim of Continuum Energy Technologies, LLC [Claim No. 6-1]* [Doc. No. 364] (the "Claim Objection") of IDL Development, Inc. ("IDL" or the "Debtor") to the portion of Claim No. 6-1 filed by Continuum Energy Technologies, LLC ("CET") asserting an administrative priority claim in the amount of $2,141,682.71 pursuant to 11 U.S.C. § 507(a)(2)[1] (the "Priority Claim"), *Continuum Energy Technologies, LLC's Response to Debtor's Objection to Priority Claim* [Doc. No. 388] as supplemented by the *Supplemental Declaration of Todd A. Sullivan, Esq.* [Doc. No. 405] (collectively, the "Response"), the arguments of counsel at a hearing on October 16, 2019 regarding the Claim Objection (the "Hearing"), evidence introduced at prior hearings in this case, and the docket of this case, the Court sustains the Claim Objection and rules that CET's Priority Claim is disallowed for the reasons set forth below.

**Facts and Applicable Law**

In Claim No. 6-1, CET asserts a total claim in the amount of $38,500,000 for "future running royalties" pursuant to a license agreement dated March 15, 2018 (the "License

---

[1] While not specifically cited in the Priority Claim, based on the arguments made by CET in subsequent pleadings and at a hearing on the Claim Objection, the Court understands that CET claims an administrative expense under § 503(b)(1)(A).

Document      Page 2 of 8

Agreement") by which CET licensed to the Debtor certain patents and other intellectual property (the "Licensed IP") relating to electromagnetic chemistry applications using engineered carbon. CET contends that the Priority Claim should be allowed on account of asserted diminution in value of the Licensed IP after commencement of the Debtor's bankruptcy case, consisting of a daily diminution of $18,786.69 for 114 days that "will continue to accrue until the [License] Agreement is rejected." Claim 6-1, Ex. B.

The Bankruptcy Code provides that administrative expenses include "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Claims for administrative expenses have priority over, *inter alia*, general unsecured claims against the estate. *See* 11 U.S.C. § 507(a)(2). A party seeking priority treatment has the burden of proving entitlement to statutory priority. *Mason v. Official Comm. of Unsecured Creditors (In re FBI Distribution Corp.)*, 330 F.3d 36, 42 (1st Cir. 2003). "In general, for a claim to qualify as an administrative expense under subsection 503(b)(1), (1) it must have arisen from a transaction with the trustee or debtor in possession, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the claim must have benefitted the estate in some demonstrable way." *Id.* (citing *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.*, 954 F.2d 1, 5 (1st Cir. 1992)). These requirements are set forth in the conjunctive and both must be met for an administrative claimant to be entitled to priority. *See, e.g., In re Hopkinton Indep. Sch., Inc.*, 499 B.R. 158, 162 (Bankr. D.N.H. 2013) (holding that "if a transaction is determined not to have benefitted the estate of the debtor, a court need not also determine whether the transaction took place with the debtor estate"). Additionally, section 503 priorities are to be construed narrowly "because of the presumption that the debtor has limited resources to equally distribute among creditors." *In re Kmart Corp.*, 290 B.R. 614, 621 (Bankr. N.D. Ill. 2003) (citing

*Isaac v. Texmex Energy, Inc. (In re Amarex)*, 853 F.2d 1526, 1530 (10th Cir. 1988) and *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 953 (1st Cir. 1976) ("To give priority to a claimant not clearly entitled thereto is inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer.")).

In a Chapter 11 case, a debtor may determine whether to assume or reject an executory contract, such as the License Agreement, at any time prior to confirmation. *See* 11 U.S.C. § 365; *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1215 (7th Cir. 1984). In this case, CET appropriately pursued its available remedies to seek to mitigate the alleged decrease in value of the Licensed IP by moving to compel the Debtor to assume or reject the License Agreement and by seeking relief from the automatic stay to terminate the License Agreement. Each of those motions was denied. In connection with the stay relief motion, the Court (Feeney, J.) held that "CET did not introduce any evidence from which this Court could find that the Debtor's interest in the License Agreement with CET was a 'wasting asset.'" *See* Stay Order, [Doc. No. 105] at 2–3. CET sought leave to appeal the Stay Order to the extent it was deemed to be interlocutory, but the Bankruptcy Appellate Panel for the First Circuit denied CET's motion for leave to appeal. Decision dated May 23, 2019 [Doc. No. 214].

The Debtor ultimately moved to reject the License Agreement on August 30, 2019, after the Court approved a sale of its assets that did not include the assumption and assignment of the License Agreement. The Court granted that motion on September 13, 2019. The Debtor asserts that it did not use the Licensed IP after the petition date, and, therefore, there was no postpetition "transaction" between the Debtor and CET and no demonstrable benefit to the estate. CET contends that any intellectual property owned by the Debtor was derivative of the Licensed IP

3

and that the Debtor benefited its sale process by maintaining the License Agreement during the period that it marketed its assets.

The terms of the License Agreement are not in dispute. The License Agreement provides for royalty payments only if the Debtor commercialized the Licensed IP or products using the Licensed IP. Claim 6-1, Ex. A (Article 2 "Grant of Right" and Article 3 "Royalties and Payment Terms"). In relevant part, the License Agreement provides that the Debtor shall pay royalties up to $48,000,000 to CET based upon specified percentages of (i) the Debtor's net sales of products developed by the Debtor with the Licensed IP and (ii) income received by the Debtor from sublicensing the Licensed IP (collectively, the "CET Royalties"). It is uncontested that the Debtor did not commercialize technology using the Licensed IP by selling any products or sublicensing the Licensed IP prior to or during its bankruptcy.[2] CET acknowledged on the record at the Hearing that the Debtor did not engage in any postpetition activity that would have given rise to a payment obligation under the License Agreement.

**Analysis**

CET is not entitled to administrative priority for a claim arising from the License Agreement where no postpetition payments became due under the terms of that agreement. *See In re Death Row Records, Inc.*, No. 2:06-bk-11205, 2014 WL 2526963, at *6 (Bankr. C.D. Cal. May 9, 2014) (finding no priority claim because the claimant failed to allege any postpetition sales by the debtor that would arise to entitlement of royalties based on the terms of the contract). An "actual, necessary cost[] and expense[] of preserving [an] estate" constituting an administrative expense under § 503(b)(1)(A) entitled to priority under § 507(a)(2) should be

---

[2] The Debtor has acknowledged that it failed to make a $9,500,000 "License Fee Payment" due under the License Agreement prior to the petition date. The License Fee Payment is the subject of Claim No. 5-1 filed by CET.

narrowly construed to ensure fair distribution of the assets of a bankruptcy estate in accordance with the distribution priorities established by the Bankruptcy Code. *See In re FBI Distribution Corp.*, 330 F.3d at 49 n.16 (recognizing that Congress balanced the equities in Chapter 11 "in favor of reorganization and equality of distribution of the limited assets to *all* unsecured creditors" and against counterparties to an executory contract); *In re Kmart Corp.*, 290 B.R. at 621. CET has not met its burden to demonstrate that the Debtor engaged in activity after the petition date that triggered royalty payment obligations under the License Agreement or otherwise resulted in a payment obligation under that executory contract. CET received all consideration to which it was entitled under the License Agreement during the postpetition period prior to rejection of that contract. The extra-contractual "damage" claim for alleged diminution in the value of the Licensed IP and "purported" value conferred on the Debtor in its sale process asserted by CET is speculative and does not meet the requirements of § 503(b)(1)(A). *Cf. Broad. Corp. of Ga. v. Broadfoot, II (In re Subscription Television of Greater Atlanta)*, 789 F.2d 1530, 1532 (11th Cir. 1986) (reducing the allowed amount of an administrative expense claim to contract payments for services actually used and denying an administrative expense claim for contract payments for period when services were not used during a pre-rejection sale process and observing: "That which is thought to have some potential benefit, in that it makes a business more likely salable, may be a benefit but is too speculative to be allowed as an 'actual, necessary cost and expense of preserving the estate.'").

Generally, a claimant is not entitled to an administrative claim because a debtor does not immediately reject an executory contract. *See, e.g., Kmart Corp.*, 290 B.R. at 621.  CET pursued its available remedies to protect against the damages that it alleges by seeking to compel

rejection and obtain relief from the automatic stay.[3] CET was unsuccessful in persuading the Court that the alleged diminution in value of the Licensed IP constituted cause to grant either of those motions; the Court will not now approve an administrative priority claim where the License Agreement does not provide a basis to claim any amounts due from the Debtor arising from the Debtor's postpetition activities. The First Circuit Court of Appeals has noted that Chapter 11 may be a "harsh reality" for counterparties to executory contracts with a debtor. *In re FBI Distribution Corp.*, 330 F.3d at 46 n.16, 47. In connection with its claim for administrative priority, CET asserts a per diem measure of damages based on royalties that may have become due under the License Agreement if the Debtor had commercialized the Licensed IP. When an executory contract is ultimately rejected, damages for loss of future potential value of that contract are properly considered as unsecured, non-priority rejection damage claims. 11 U.S.C. §§ 365(g)(1), 502(g); *see also In re FBI Distribution Corp.*, 330 F.3d at 42 (citations omitted); *In re Old Carco LLC*, 424 B.R. 633, 639–40 (Bankr. S.D.N.Y. 2010) (the Bankruptcy Code specifically treats rejection damage claims as prepetition claims with general unsecured status under § 365(g), which allows the non-debtor party to still have a claim against the debtor, and "that affording rejection claims administrative priority would effectively eliminate the purpose behind providing a debtor with the power to reject a contract").

CET has cited no authority supporting the proposition that a claim for administrative expense priority may be allowed where the underlying contract that has later been rejected does not provide for any payment obligation on account of a debtor's postpetition activity.[4] Further,

---

[3] *See In re FBI Distribution Corp.*, 330 F.3d at 49 n.16 (recognizing the balance struck by Congress to narrowly construe administrative expense claims and the remedy of a party to an executory contract to seek to compel rejection of an executory contract pursuant to 365(d)(2)).

[4] The case cited by CET in support of its position falls short because in that case the court approved an administrative expense claim in the amount of unpaid lease payments *provided for under the applicable executory contract. See Kimzey v. Premium Casing Equip., LLC*, No. 16-CV-01490, 2018 WL 1321971, at *6 (W.D. La. Mar.

CET has not cited any case, and the Court has found none, where a court has allowed an administrative expense claim under § 503(b)(1)(A) for value conferred on an estate that exceeds amounts that would have been due pursuant to the underlying executory contract.

In cases where an executory contract that is later rejected provides for postpetition payments, courts will sometimes apply a presumption in favor of the contract "rate" as reflective of the value of the benefit conferred in the absence of rebuttal evidence that the value conferred to the estate was less than the contract rate in considering allowance of an administrative expense claim. *See In re Highway Techs.*, No. 13-11326, 2015 Bankr. LEXIS 308, at *18–19 (Bankr. D. Del. Jan. 30, 2015) (allowing an administrative expense for number of terminals where software was actually used, instead of the bargained for use at up to 100 terminals); *see also In re Sportsman's Warehouse, Inc.*, 436 B.R. 308, 315 (Bankr. D. Del. 2009) (in the rent context, explaining that the amount of benefit to the estate is presumed to be the contract rate, but that may be reduced if the debtor can prove the benefit to the estate is lower); *In re Bridgeport Plumbing Prods., Inc.,* 178 B.R. 563, 569–70 (Bankr. M.D. Ga. 1994) (in equipment lease context, the debtor rejected lease more than three months after filing date, but only used equipment for a total of ten hours, and the court calculated hourly lease amount by hours equipment actually used for total amount entitled to an administrative claim). It is in this context

---

14, 2018) (affirming bankruptcy court's finding due to the absence of a bright line rule in the Fifth Circuit, and explaining that although there was no direct profit from leased equipment, the leased equipment provided intangible benefit to the estate). The focus of the court in *Kimzey* was whether the debtor's estate benefitted through the "increased capacity to respond to potential customer demand" and availability of on-site equipment in the event of a mechanical problem and whether the value of that benefit was the lease payment amount or a lesser amount. *See id.* at *1–2; *see also In re Kimzey Casing Serv., LLC*, No.15-51337, Doc. No 42: *Motion for Allowance and Payment of Administrative Expense Pursuant to 11 U.S.C. § 503(b)(1)(A)*, at 2 (Bankr. D. La. May 16, 2016) (claimant seeking an administrative expense for unpaid monthly rental invoices for the equipment pursuant to leases, for a total of $57,752.93 representing a $11,225.81 11/20/2015 invoice and a $46,527.12 12/23/2015 invoice); *accord Kimzey*, 2018 WL 1321971 at *1 ("The Bankruptcy Court allowed an administrative expense claim in the amount of $57,752.93").

that courts often use broad language regarding a debtor's obligation to pay the "reasonable value" of postpetition services or other consideration provided by the counterparty to an executory contract. For example, the First Circuit Court of Appeals has noted: "If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay *for the reasonable value of those services,* which, depending on the circumstances of a particular contract, may be what is specified in the contract." *In re FBI Distribution Corp.*, 330 F.3d at 45 (emphasis in original) (denying administrative priority claim for severance payments that became due postpetition). The Court does not read the language of *FBI Distribution* or the similar language in other cases to contemplate that an administrative expense claim under § 503(b)(1)(A) may be allowed in an amount that *exceeds* the amount of payment obligations provided for in the executory contract.

**Conclusion**

For the reasons above, the Court sustains IDL's Claim Objection and disallows CET's Priority Claim. CET may only assert a general unsecured claim against the estate for rejection damages. *See* 11 U.S.C. § 365(g)(1).

| | |
|---|---|
| Dated: November 1, 2019 | By the Court, |
| | _____ |
| | Christopher J. Panos |
| | United States Bankruptcy Judge |